**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| (1) GEORGE P. ASSAD, JR., On Behalf of Himself and All Others Similarly Situated, | ) ) | |
| | ) | Case No. 14-cv-707-GKF-TLW |
| Plaintiff, | ) ) | |
| v. | ) ) | **CLASS ACTION** |
| | ) ) | **JURY TRIAL DEMANDED** |
| (1) APCO OIL AND GAS INTERNATIONAL, INC., | ) ) | |
| (2) RICHARD E. MUNCRIEF, | ) | |
| (3) BRYAN K. GUDERIAN, | ) | |
| (4) J. KEVIN VANN, | ) | |
| (5) KEITH BAILEY, | ) | |
| (6) PIERO RUFFINENGO, | ) | |
| (7) ROBERT LAFORTUNE, | ) | |
| (8) PLUSPETROL RESOURCES CORPORATION, and | ) ) | |
| (9) PLUSPETROL BLACK RIVER CORPORATION, | ) ) | |
| | ) ) | |
| Defendants. | ) | |

**CLASS ACTION COMPLAINT FOR BREACH OF FIDUCIARY DUTIES AND
INDIVIDUAL CLAIMS FOR VIOLATION OF SECTIONS 14(a) AND 20(a)
OF THE SECURITIES EXCHANGE ACT OF 1934**

Plaintiff, by his undersigned attorneys, alleges upon personal knowledge with respect to

himself, and upon information and belief based upon, *inter alia*, the investigation of counsel as to

all other allegations herein, as follows:

**NATURE OF THE ACTION**

1.      This is an individual and class action brought on behalf of the public stockholders

of Apco Oil and Gas International Inc. ("Apco" or the "Company") against Apco and its Board

of Directors (the "Board" or the "Individual Defendants"), to enjoin a proposed transaction

announced on October 3, 2014 (the "Proposed Transaction"), pursuant to which Apco will be

acquired by Pluspetrol Resources Corporation ("Parent") and its wholly-owned subsidiary, Pluspetrol Black River Corporation ("Merger Sub," and together with Parent, "Pluspetrol").

2.      On October 2, 2014, the Board caused Apco to enter into an agreement and plan of merger (the "Merger Agreement").   Pursuant to the terms of the Merger Agreement, Pluspetrol will acquire each ordinary share and Class A share of the Company for the right to receive $14.50 in cash, in a transaction valued at approximately $427 million.   Following the consummation of the Proposed Transaction, Merger Sub will merge with and into the Company, with the Company continuing as the surviving company and a wholly-owned subsidiary of Parent.

3.      The Proposed Transaction is the product of a flawed process and deprives Apco's public stockholders of the ability to participate in the Company's long-term prospects. Furthermore, in approving the Merger Agreement, the Individual Defendants breached their fiduciary duties to plaintiff and the Class (defined herein).   Moreover, as alleged herein, Apco and Pluspetrol aided and abetted the Individual Defendants' breaches of fiduciary duties.

4.      Compounding the unfairness of the Proposed Transaction, defendants issued materially incomplete and misleading disclosures in the Proxy Statement (the "Proxy") filed with the United States Securities and Exchange Commission ("SEC") on October 31, 2014.   The Proxy is deficient and misleading in that it fails to provide adequate disclosure of all material information related to the Proposed Transaction.   Accordingly, plaintiff alleges herein that defendants violated Sections 14(a) and 20(a) of the Securities Exchange Act of 1934 (the "1934 Act") in connection with the Proxy.

5.      Plaintiff seeks enjoinment of the Proposed Transaction or, alternatively, rescission of the Proposed Transaction in the event defendants are able to consummate it.

## JURISDICTION AND VENUE

6.      This Court has jurisdiction over all claims asserted herein pursuant to Section 27 of the 1934 Act because the claims asserted herein arise under Sections 14(a) and 20(a) of the 1934 Act and Rule 14a-9.

7.      This Court has jurisdiction over defendants because each defendant is either a corporation that conducts business in and maintains operations within this District, or is an individual with sufficient minimum contacts with this District so as to make the exercise of jurisdiction by this Court permissible under traditional notions of fair play and substantial justice.

8.      Venue is proper under 28 U.S.C. § 1391(b) because a substantial portion of the transactions and wrongs complained of herein occurred in this District.

## PARTIES

9.      Plaintiff is, and has been continuously throughout all times relevant hereto, the owner of Apco common stock.

10.      Defendant Apco is a Cayman Islands exempted company limited by shares and maintains its principal executive offices at One Williams Center, 35th Floor, Tulsa, Oklahoma 74172.  The Company is an international oil and gas exploration and production company with interests in nine oil and gas concessions and two exploration permits in Argentina, and three exploration and production contracts in Colombia.  Apco's common stock is traded on the NasdaqCM under the ticker symbol "APAGF."

11.      Defendant Richard E. Muncrief ("Muncrief") has served as a director of Apco since 2014 and currently serves as Chairman of the Board.  Muncrief also is President and Chief Executive Officer ("CEO") of WPX Energy, Inc. ("WPX"), which holds approximately sixty-nine percent of the Company's shares.

12.     Defendant Bryan K. Guderian ("Guderian") has served as a director of Apco since 2002 and has served as CEO since December 2013.  Guderian also is Senior Vice President of Business Development of WPX.

13.     Defendant J. Kevin Vann ("Vann") has served as a director of Apco since 2014. Vann also is Senior Vice President and Chief Financial Officer ("CFO") of WPX.

14.     Defendant Keith Bailey ("Bailey") has served as a director of Apco since 2002. According to the Company's Annual Proxy Statement filed with the SEC on March 20, 2014 (the "2014 Proxy"), Bailey is a member of the Audit Committee and Chairperson of the Nominating Committee.

15.     Defendant Piero Ruffinengo ("Ruffinengo") has served as a director of Apco since 2002.  According to the 2014 Proxy, Ruffinengo is a member of the Audit Committee and the Nominating Committee.

16.     Defendant Robert LaFortune ("LaFortune") has served as a director of Apco since 1998.  According to the 2014 Proxy, LaFortune is Chairperson of the Audit Committee and a member of the Nominating Committee.

17.     The defendants identified in paragraphs eleven through sixteen are collectively referred to herein as the "Individual Defendants."  By virtue of their positions as directors and/or officers of Apco, the Individual Defendants are in a fiduciary relationship with plaintiff and the other public stockholders of Apco.

18.     Each of the Individual Defendants at all relevant times had the power to control and direct Apco to engage in the misconduct alleged herein.  The Individual Defendants' fiduciary obligations required them to act in the best interest of plaintiff and all Apco stockholders.

4

19.    Each of the Individual Defendants owes fiduciary duties to plaintiff and the other members of the Class.  The Individual Defendants are acting in concert with one another in violating their fiduciary duties as alleged herein, and, specifically, in connection with the Proposed Transaction.

20.    The Company's public stockholders must receive the maximum value for their shares through the Proposed Transaction.  Plaintiff alleges herein that the Individual Defendants, separately and together, in connection with the Proposed Transaction, violated, and are continuing to violate, the fiduciary duties they owe to plaintiff and the Company's other public stockholders, due to the fact that they have engaged in all or part of the unlawful acts, plans, schemes, or transactions complained of herein.

21.    Defendant Parent is a company incorporated under the laws of the Cayman Islands.

22.    Defendant Merger Sub is a Cayman Islands exempted company limited by shares and a wholly-owned subsidiary of Parent.

## CLASS ACTION ALLEGATIONS

23.    Plaintiff brings this action as a class action, on behalf of himself and the other public stockholders of Apco (the "Class").  Excluded from the Class are defendants herein and any person, firm, trust, corporation, or other entity related to or affiliated with any defendant.

24.    This action is properly maintainable as a class action.

25.    The Class is so numerous that joinder of all members is impracticable.  As of the close of business on August 4, 2014, there were approximately 9,139,650 ordinary shares and 20,301,592 Class A shares of Apco common stock outstanding, held by hundreds, if not thousands, of individuals and entities scattered throughout the country.

26.     Questions of law and fact are common to the Class, including, among others: (i) whether defendants have breached their fiduciary duties owed to plaintiff and the Class; and (ii) whether defendants will irreparably harm plaintiff and the other members of the Class if defendants' conduct complained of herein continues.

27.     Plaintiff is committed to prosecuting this action and has retained competent counsel experienced in litigation of this nature.  Plaintiff's claims are typical of the claims of the other members of the Class and plaintiff has the same interests as the other members of the Class.  Accordingly, plaintiff is an adequate representative of the Class and will fairly and adequately protect the interests of the Class.

28.     The prosecution of separate actions by individual members of the Class would create the risk of inconsistent or varying adjudications that would establish incompatible standards of conduct for defendants, or adjudications that would, as a practical matter, be dispositive of the interests of individual members of the Class who are not parties to the adjudications or would substantially impair or impede those non-party Class members' ability to protect their interests.

29.     Defendants have acted, or refused to act, on grounds generally applicable to the Class as a whole, and are causing injury to the entire Class.  Therefore, final injunctive relief on behalf of the Class is appropriate.

## SUBSTANTIVE ALLEGATIONS

### Background of the Company

30.     Apco, which became a public company in 1978, is an international oil and gas exploration and production company with a focus on South America.  Apco began exploration and production activities in Argentina in the late 1960s and has interests in eight oil and gas

producing concessions and two exploration permits in Argentina, and three exploration and production contracts in Colombia.

31.     The Company's producing operations are located in the Neuquén, Austral, and Northwest basins in Argentina.    It also has exploration activities in both Argentina and Colombia.  The Company's core assets are located in the Neuquén basin in the provinces of Rio Negro and Neuquén in southwest Argentina.

32.     Apco's strategy is to develop and grow its assets in Argentina and Colombia, and conduct business development efforts with a goal of expanding the Company into other South American countries.

33.     The Company is positioned for future growth and success.  On July 30, 2014, the Company issued a press release announcing that it had successfully completed its Llanos basin exploration drilling program for 2014.  In Llanos 32, where Apco participates with a twenty percent interest, three exploration wells were drilled year-to-date. All three wells – the Kananaskis-1, Carmentea-1, and the Calona-1 – discovered proved reserves.

34.     Following the successful exploration drilling, Apco and its partners began development and appraisal drilling.  The Kananaskis-2 well was drilled to appraise the Une and Gacheta formations where natural gas and natural gas liquids were produced in the Kananaskis-1 test.  Kananaskis-2 was drilled and cased, with testing planned for the third quarter.  Since the end of the second quarter, Apco drilled a water disposal well for Carmentea and the Kananaskis-3 Mirador appraisal well, and spud the Kananaskis-4 disposal well.

35.     In the Llanos 40 block, where Apco has a fifty percent working interest, four exploration wells were drilled to fulfill the initial exploration phase commitments.  The first two wells – the Celtis-1 and Ardisia-1 – were drilled from the same pad and tested during the second

quarter. The Celtis-1 well discovered proved reserves from the Une formation. The third well drilled in the Llanos 40 block, the Begonia-1, discovered oil from the Carbonera 7 formation.

36.    With respect to these developments, Michael Kyle ("Kyle"), Apco's President and Chief Operating Officer of the Company, commented:

> We are very pleased to see success from our exploration strategy in Colombia. We expect these discoveries to deliver strong results and provide meaningful increases to our production in the second half of 2014 and beyond. With the intensive exploration program wrapping up, our efforts have turned to development and evaluating the resources discovered to date[.]

37.    Despite Apco's prospects for future growth and success, the Company entered into the Merger Agreement to be acquired by Pluspetrol.

***Flawed Process Leading to Proposed Transaction***

38.    The Proposed Transaction is the result of a flawed and unusual process.

39.    As set forth in the Proxy, in March 2013, representatives from WPX, which holds approximately sixty-nine percent of the Company's shares, informed Individual Defendant Bailey that it was considering pursuing a sale of its Apco shares. WPX indicated that it had no interest in, and would not support, a sale of all of the outstanding Company shares at that time.

40.    On April 22, 2013, "Party A," a privately-held oil and gas company, approached WPX expressing its desire to purchase all of WPX's Apco shares. WPX and the Company subsequently entered into a confidentiality agreement with Party A.

41.    On May 7, 2013, the Board met and determined to form a special committee (the "Special Committee") to interact directly with WPX on behalf of the Company. Individual Defendants Bailey and LaFortune were appointed as the sole members of the Special Committee with Bailey appointed to serve as the committee's Chairman.

42.     At the end of August 2013, WPX advised the Board that it had elected to proceed with a full marketing process for its Apco shares, as well as its interests in Apco Argentina, S.A. (the "WPX Argentine Interests"), a subsidiary of the Company of which WPX owns five percent, and Northwest Argentina Corporation, an entity in which WPX owns 100 percent of the equity interests.  WPX ultimately distributed marketing materials to eighty parties, nineteen of which expressed an interest in receiving further information about the potential acquisition of WPX's Company shares.  Between October 1, 2013 and January 20, 2014, the Company and WPX entered into confidentiality agreements with thirteen interested parties, including an affiliate of Parent, which parties subsequently engaged in due diligence.

43.     In December 2013, WPX held meetings with three oil and gas corporations to discuss the Company's assets in the Vaca Muerta, which, according to a recent *The Economist* article, is "a shale formation the size of Belgium" and potential source of substantial wealth. Following the meetings, one of the corporations expressed an interest in further discussions, and subsequently executed a confidentiality agreement.

44.     In February 2014, WPX's financial advisor, Merrill Lynch, Pierce, Fenner & Smith Incorporated ("Merrill Lynch"), sent process letters to seven remaining interested parties inviting them to submit written indications of interest by March 11, 2014.  Party A, Party B, which is a privately-held oil and gas company with operations in Latin America, Asia, and the Middle East, and Party C, which is a privately-held oil and gas company with operations in Argentina, submitted indications of interest to purchase all of WPX's Apco shares and the WPX Argentine Interests for $316 million, $300 million, and $162 million, respectively.

45.    On April 14, 2014, WPX entered into an exclusivity agreement with Party A pursuant to which WPX agreed to negotiate exclusively with Party A until May 29, 2014, which deadline was later extended until July 3, 2014.  Party A revised its original offer to $312 million.

46.    Following the expiration of WPX's exclusivity period with Party A, WPX determined to engage in a limited marketing process for its Apco shares, and Merrill Lynch contacted parties previously involved in the process as well as an undisclosed number of new parties.  In response, three new parties and four parties previously involved in the process, including Parent, expressed an interest in further discussions.

47.    On July 7, 2014, Parent communicated to WPX that it was interested in acquiring WPX's shares for $11.34 per share in cash. WPX responded that it was not interested in a transaction at that price.

48.    On July 11, 2014, Parent expressed its desire to purchase *all* of Apco's shares of common stock for $11.34 per share.  WPX, apparently speaking on the Company's behalf, stated that it was not interested in a transaction at that price.

49.    The Company and WPX subsequently entered into confidentiality agreements with the three new interested parties.

50.    On August 12, 2014, Parent submitted a non-binding offer to WPX to purchase all of Apco's shares for $15.00 per share in cash and to purchase the WPX Argentine Interests for $2.00.

51.    In August 2014, WPX received non-binding offers for its Apco shares and the WPX Argentine Interests from each of Party B; Party D, a publicly-traded oil and gas company with operations in Argentina; Party E, a publicly-traded integrated energy company with oil and gas assets in Argentina; Party F, a privately-held investment fund with investments in financial,

telecommunications and industrial assets primarily in Latin America; and Party G, a publicly-traded conglomerate with oil and gas exploration activities in the United States and other businesses primarily focused in North and South America. Party B submitted a revised non-binding offer of $310 million. Party D indicated a non-binding offer in the range of $270 million to $300 million. Party E submitted a non-binding offer of $200 million. Party F and Party G made verbal indications for WPX's shares "at or around the then-current Nasdaq trading price for the Company Shares." The Proxy does not disclose the values of these indications of interest.

52.     In late August 2014, Individual Defendant Guderian, CEO of Apco but also Senior Vice President of Business Development of WPX, informed Individual Defendant Bailey of Parent's offer.

53.     On August 29, 2014, WPX entered in an exclusivity agreement with Parent pursuant to which WPX agreed to negotiate exclusively with Parent until September 28, 2014.

54.     On September 4, 2014, the Board appointed a transaction advisory group (the "TAG") to oversee discussions and negotiations with Parent, consisting of Individual Defendants Bailey, Guderian, and Vann, a director of the Company and Senior Vice President and CFO of WPX.

55.     According to the Proxy, on September 24, 2014, Parent raised an undisclosed "diligence matter that materially affected its view of the value of the Company[.]" The following day, Parent requested that the purchase price be reduced to $14.11 per share in cash. Following discussions, the parties agreed on a tentative adjustment to the purchase price of $14.50 per share in cash.

56.     On October 1, 2014, the Board met and, apparently for the first time, Apco's legal counsel in connection with the Proposed Transaction, Weil, Gotshal & Manges LLP ("Weil"),

"discussed the work it had done for WPX, which included the representation of WPX in its earlier negotiations with Party A regarding the sale of WPX's Company Shares, and the fact that Weil *was also representing a consortium that included Parent*[.]"  (Emphasis added).

57.    The Board met the next day to review the final terms of the Proposed Transaction with Parent.  The Company's financial advisor, Jefferies LLC ("Jefferies"), which was not engaged until mid-September 2014 and apparently was not involved in the process, delivered its opinion that Parent's offer of $14.50 per share was fair, from a financial point of view, to the Company's shareholders.  The Board subsequently approved the Merger Agreement, which was executed later that evening.

***The Inadequate Proposed Transaction and Preclusive Deal Protection Terms***

58.    Despite the Company's prospects for future growth and success, particularly as a result of its assets in Vaca Muerta, the Company entered into the Merger Agreement, pursuant to which the Company will be acquired for only $14.50 per share.

59.    To the detriment of the Company's stockholders, the terms of the Merger Agreement substantially favor Pluspetrol and are calculated to unreasonably dissuade potential suitors from making competing offers.

60.    For example, the Individual Defendants have all but ensured that another entity will not emerge with a competing proposal by agreeing to a "No Solicitation" provision in Section 6.5 of the Merger Agreement that prohibits the Individual Defendants from soliciting alternative proposals and severely constrains their ability to communicate and negotiate with potential buyers who wish to submit or have submitted unsolicited alternative proposals.  Section 6.5(a) of the Merger Agreement states:

(a) Except as permitted by this Section 6.5, from the date of this Agreement until the Effective Time or, if earlier, the termination of this Agreement in accordance with its terms, the Company will not, nor shall it authorize or permit any of its Subsidiaries to, and shall cause its and their respective Representatives not to, directly or indirectly (i) initiate, solicit or knowingly encourage or knowingly facilitate the making of an Acquisition Proposal or Acquisition Inquiry . . . , (ii) other than informing Third Parties of the existence of the provisions contained in this Section 6.5, engage in negotiations or discussions with, or furnish any non-public information concerning the Company or any of its Subsidiaries to, any Third Party who has made or in response to an Acquisition Proposal or Acquisition Inquiry or (iii) resolve or agree to do any of the foregoing. The Company shall, and shall cause its Subsidiaries to, and shall cause its and their respective Representatives to (i) immediately cease and cause to be terminated all existing discussions or negotiations with any Person conducted heretofore with respect to any Acquisition Proposal or Acquisition Inquiry and (ii) promptly request that all confidential information provided by or on behalf of the Company or any of its Affiliates to any such Person in connection with such discussions or negotiations be returned or destroyed.

61.    Further, pursuant to Section 6.5(e) of the Merger Agreement, the Company must advise Parent, within twenty-four hours, of any proposals or inquiries received from other parties, including, *inter alia*, the material terms and conditions of the proposal and the identity of the party making the proposal.  Section 6.5(e) of the Merger Agreement states:

(e) Except to the extent prohibited by any confidentiality agreement or similar agreement entered into prior to the date hereof, the Company shall promptly (and in any event within 24 hours after any director, officer or financial advisor of the Company is notified of the receipt thereof) advise Parent in writing in the event that the Company receives any Acquisition Proposal or Acquisition Inquiry, and in connection with such notice, provide to Parent the material terms and conditions of any such Acquisition Proposal and the identity of the Third Party making any such Acquisition Proposal or Acquisition Inquiry. The Company shall (i) keep Parent reasonably informed of the status and material details (including any material change to the terms thereof) of any such Acquisition Proposal or such Acquisition Inquiry and any discussions and negotiations concerning the material terms and conditions thereof and (ii) provide to Parent as soon as practicable (and in any event within 24 hours) after receipt or delivery thereof copies of all material correspondence and other material written material exchanged between the Company or any of its Subsidiaries and any Person that describes any of the material terms or conditions of any such Acquisition Proposal or Acquisition Inquiry.  Without limiting the foregoing, the Company shall promptly (and in any event within 24 hours) notify Parent in writing if it determines to begin providing information or engaging in discussions or

negotiations concerning an Acquisition Proposal pursuant to Section 6.5(b). The Company shall not, and shall cause its Subsidiaries not to, in any way contract with any Person subsequent to the date of this Agreement in a manner that would restrict the Company's ability to provide information to Parent as required under this Agreement.

62.     Moreover, the Merger Agreement contains a highly restrictive "fiduciary out" provision permitting the Board to withdraw its approval of the Proposed Transaction under extremely limited circumstances, and grants Parent a "matching right" with respect to any "Superior Proposal" made to the Company.  Section 6.5(e) of the Merger Agreement provides:

(e) Notwithstanding Section 6.5(c) or anything else in this Agreement to the contrary, at any time before the Approval Time, the Company Board may, if the Company Board determines in its good faith judgment, after consulting with outside counsel, that the failure to effect an Adverse Recommendation Change would reasonably be expected to be inconsistent with the Company Board's fiduciary duties under Law (x) make an Adverse Recommendation Change in response to an Intervening Circumstance or (y) in response to a Superior Offer, make an Adverse Recommendation Change and cause the Company to terminate this Agreement and enter into one or more definitive Alternative Acquisition Agreements with respect to a Superior Offer pursuant to Section 8.1(c)(ii); provided, that, . . . (ii) with respect to an Adverse Recommendation Change in response to a Superior Offer, no such Adverse Recommendation Change may be made, and no termination of this Agreement pursuant to Section 8.1(c)(ii) may be made, unless (A) the Company shall have delivered to Parent a written notice advising Parent that the Company Board intends to make an Adverse Recommendation Change and terminate this Agreement pursuant to Section 8.1(c)(ii) (a "Notice of Superior Offer") (it being understood that the delivery of such notice shall not itself constitute an Adverse Recommendation Change), specifying in reasonable detail the material terms and conditions of such Superior Offer, accompanied by a copy of the then current form of any agreement with respect to such Superior Offer that the Company has received from the Person that made such Superior Offer (the "Third Party Offeror"); (B) at least four Business Days shall have elapsed following the delivery of such Notice of Superior Offer (it being agreed that (x) any Third Party Offeror subject to an Acceptable Confidentiality Agreement or an Existing Confidentiality Agreement shall not be permitted pursuant to the terms of such Acceptable Confidentiality Agreement or Existing Confidentiality Agreement or any waiver granted pursuant to Section 6.5(a) to make any additional Acquisition Proposals or modify or amend the financial or other material terms of such Superior Offer in response to adjustments to the terms and conditions of this Agreement made by Parent pursuant to the terms of this Section 6.5(d)(ii) and (y) any amendment to the financial or other material terms of such Superior Offer made by a Third Party

14

Offeror not subject to an Acceptable Confidentiality Agreement or an Existing Confidentiality Agreement will require a new Notice of Superior Offer, except that the applicable time period for purposes of this Section 6.5(d)(ii) with respect to such new Notice of Superior Offer shall be reduced to two Business Days from the four Business Days otherwise contemplated); (C) during such period of four Business Days (or, if applicable, such two Business Day period) following the delivery of such Notice of Superior Offer, the Company shall have, and shall have instructed its financial advisors and outside legal counsel to have, negotiated in good faith with Parent (if Parent shall have requested in writing that the Company and its financial advisors and outside legal counsel to so negotiate) regarding adjustments to the terms and conditions of this Agreement as would enable the Company Board to determine not to make an Adverse Recommendation Change and terminate this Agreement pursuant to Section 8.1(c)(ii); and (D) the Company Board shall have in good faith taken into account any revisions to the terms and conditions of this Agreement proposed in writing by Parent to the Company by 5 p.m. Eastern Time on the last day of such period of four Business Days (or, if applicable, two Business Day period); provided that, in the event that the Shareholder is receiving at least $15.00 per Company Share (and all other Company Shareholders are entitled to receive an equal or greater amount of consideration per Company Share) pursuant to any changes to the financial and other terms of this Agreement proposed by Parent to the Company pursuant to this Section 6.5(d)(ii), the Company shall consider such revised terms and conditions presented by Parent as though the Shareholder were to receive the same consideration per Company Share as the other Company Shareholders.

63.     Further locking up control of the Company in favor of Pluspetrol is Section 8.3 of the Merger Agreement, which contains a provision for a "Termination Fee" of $15.45 million, payable by the Company to Parent if the Individual Defendants cause the Company to terminate the Merger Agreement pursuant to the lawful exercise of their fiduciary duties.

64.     By agreeing to all of the deal protection devices, the Individual Defendants have locked up the Proposed Transaction and have precluded other bidders from making successful competing offers for the Company.

65.     Moreover, WPX, holding approximately sixty-nine percent of the Company's shares, entered into an irrevocable limited power of attorney (the "Power of Attorney") in connection with the Proposed Transaction. The Power of Attorney grants to Appleby Trust

(Cayman) Ltd. the power to vote WPX's Class A Company shares in favor of the Proposed Transaction.

66.    The consideration to be paid to plaintiff and the Class in the Proposed Transaction is unfair and inadequate because, among other things, the intrinsic value of the Company is materially in excess of the amount offered in the Proposed Transaction, particularly when taking into account the Company's assets in Vaca Muerta.  According to an August 23, 2014 article in *The Economist*, Vaca Muerta is a shale formation the size of Belgium and is "long unsuspected wealth."  According to the article, Argentina boasts the world's second-biggest shale-gas reserves, most of them in Vaca Muerta.

67.    Even Jefferies' own analyses demonstrate that the Proposed Transaction consideration is, at best, at the low end of the range of fairness.  For example, Jefferies' Comparable Public Company Analysis yields a range of $12.78 to *$36.76* per share using Enterprise Value/2P, and $12.45 to *$29.93* using Enterprise Value/Proved.

68.    Accordingly, the Proposed Transaction will deny Class members their right to share proportionately and equitably in the true value of the Company's valuable and profitable business, and future growth in profits and earnings.

69.    As a result, defendants have breached their fiduciary duties that they owe to the Company's public stockholders because the stockholders will not receive adequate or fair value for their Apco stock in the Proposed Transaction.

**The Materially Incomplete and Misleading Proxy**

70.    Defendants filed the Proxy with the SEC in connection with the Proposed Transaction.  As discussed below and elsewhere herein, the Proxy omits material information that must be disclosed to Apco's stockholders to enable them to render an informed decision

with respect to the Proposed Transaction.

71.    The Proxy omits material information with respect to the process and events leading up to the Proposed Transaction, as well as the opinions and analyses of the Company's last-minute financial advisor, Jefferies.  This omitted information, if disclosed, would significantly alter the total mix of information available to Apco's stockholders.

72.    For example, the Proxy is materially misleading in that it fails to disclose:

a.    The price at which Party A expressed interest in purchasing WPX's Apco shares in April and August 2013;

b.    The value indicated by WPX and its financial advisor for the assets in the Vaca Muerta shale in November 2013;

c.    The projected "significant" capital expenditures that would be required to explore and develop Apco's assets in Vaca Muerta;

d.    The "diligence matter that materially affected [Parent's] view of the value of the Company" on September 24, 2014; and

e.    The benchmarking points that Jefferies used in its analysis of Apco, as discussed at the October 1, 2014 Board meeting, as well as the discount that Jefferies noted for which non-operated companies are valued compared to operating companies.

73.    The Proxy fails to disclose the services Weil performed for WPX as well as the services it provided to Parent and its affiliates apparently at the same time it was representing Apco, as discussed at the October 1, 2014 Board meeting.

74.    With respect to Jefferies' Comparable Public Company Analysis, the Proxy fails to disclose the following multiples for each of the selected comparable public companies observed by Jefferies in its analysis: (i) EV/Proved and Probable Reserves; (ii) EV/Proved

reserves; and (iii) EV/Boe/Day. The Proxy also fails to disclose whether Jefferies took Apco's possible or 3P reserves into consideration as part of its analysis, and whether Jefferies performed any type of benchmarking analysis for Apco in relation to the selected comparable public companies.

75.     With respect to Jefferies' Selected Comparable Transactions Analysis, the Proxy fails to disclose: (i) the observed Transaction Value/2P and Transaction Value/Boe/Day multiples for each of the selected comparable transactions; (ii) whether Jefferies took Apco's possible or 3P reserves into consideration as part of its analysis; and (iii) whether Jefferies performed any type of benchmarking analysis for Apco in relation to the selected comparable transactions.

76.     With respect to Jefferies' "Life-of-Field" Net Asset Value Analysis, the Proxy fails to disclose: (i) the breakout of reserves between proved, probable, and possible as well as by oil, gas and liquids; (ii) the basis for the value range of $0-$1000 per acre for Vaca Muerta; (iii) the basis for the value range of $0-$250 per acre for Neuquen Basin; (iv) whether Jefferies performed any type of benchmarking analysis for Vaca Muerta and/or Neuquen Basin in relation to other similar assets; and (v) the individual inputs and assumptions that Jefferies used for the selection of discount rates of 18.0%-20.0%.

77.     With respect to the Company's projections, the Proxy fails to disclose the information or assumptions used to develop the risk adjustments used by Jefferies for each reserve type.

78.     The Proxy further fails to disclose the financial projections provided by Apco management and relied upon by Jefferies for purposes of its analysis, for fiscal years 2014-2020, and for the "remainder" period for the following items: (i) number of rigs; (ii) daily oil

production; (iii) daily gas production; (iv) daily LPG production; (v) revenue; (vi) EBIT (or DD&A); (vii) maintenance capital expenditures; (viii) exploration expenses; (ix) growth capital expenditures; (x) changes in net working capital; (xi) net income; and (xii) dividends.

## COUNT I

**(Individual Claim for Violation of Section 14(a) of the 1934 Act and Rule 14a-9 Promulgated Thereunder Against the Individual Defendants)**

79.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

80.     The Individual Defendants disseminated the false and misleading Proxy, which contained statements that, in violation of Section 14(a) of the 1934 Act and Rule 14a-9, in light of the circumstances under which they were made, omitted to state material facts necessary to make the statements therein not materially false or misleading.

81.     The Proxy was prepared, reviewed, and/or disseminated by the Individual Defendants.  By virtue of their positions within the Company, the Individual Defendants were aware of this information and their duty to disclose this information in the Proxy.

82.     The Individual Defendants were at least negligent in filing the Proxy with these materially false and misleading statements.

83.     The omissions and false and misleading statements in the Proxy are material in that a reasonable shareholder will consider them important in deciding how to vote on the Proposed Transaction.  In addition, a reasonable investor will view a full and accurate disclosure as significantly altering the total mix of information made available in the Proxy and in other information reasonably available to shareholders.

84.     The Proxy is an essential link in causing plaintiff to approve the Proposed Transaction.

85.    By reason of the foregoing, defendants violated Section 14(a) of the 1934 Act and Rule 14a-9 promulgated thereunder.

86.    Because of the false and misleading statements in the Proxy, plaintiff is threatened with irreparable harm.

## COUNT II

### (Individual Claim for Violation of Section 20(a) of the 1934 Act Against the Individual Defendants and Pluspetrol)

87.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

88.    The Individual Defendants and Pluspetrol acted as controlling persons of Apco within the meaning of Section 20(a) of the 1934 Act as alleged herein.  By virtue of their positions as officers and/or directors of Apco and participation in and/or awareness of the Company's operations and/or intimate knowledge of the false statements contained in the Proxy filed with the SEC, they had the power to influence and control and did influence and control, directly or indirectly, the decision making of the Company, including the content and dissemination of the various statements that plaintiff contends are false and misleading.

89.    Each of the Individual Defendants and Pluspetrol was provided with or had unlimited access to copies of the Proxy and other statements alleged by plaintiff to be misleading prior to and/or shortly after these statements were issued and had the ability to prevent the issuance of the statements or cause them to be corrected.

90.    In particular, each of the Individual Defendants had direct and supervisory involvement in the day-to-day operations of the Company, and, therefore, is presumed to have had the power to control and influence the particular transactions giving rise to the violations as alleged herein, and exercised the same.  The Proxy contains the unanimous recommendation of

the Individual Defendants to approve the Proposed Transaction.  They were thus directly in the making of the Proxy.

91.    Pluspetrol also had direct supervisory control over the composition of the Proxy and the information disclosed therein, as well as the information that was omitted and/or misrepresented in the Proxy.

92.    By virtue of the foregoing, the Individual Defendants and Pluspetrol violated Section 20(a) of the 1934 Act.

93.    As set forth above, the Individual Defendants and Pluspetrol had the ability to exercise control over and did control a person or persons who have each violated Section 14(a) of the 1934 Act and Rule 14a-9, by their acts and omissions as alleged herein.  By virtue of their positions as controlling persons, these defendants are liable pursuant to Section 20(a) of the 1934 Act.  As a direct and proximate result of defendants' conduct, plaintiff is threatened with irreparable harm.

## COUNT III

### (Breach of Fiduciary Duties Against the Individual Defendants)

94.    Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

95.    As members of the Company's Board, the Individual Defendants have fiduciary obligations to: (a) undertake an appropriate evaluation of Apco's net worth as a merger/acquisition candidate; (b) take all appropriate steps to enhance Apco's value and attractiveness as a merger/acquisition candidate; (c) act independently to protect the interests of the Company's public stockholders; (d) adequately ensure that no conflicts of interest exist between the Individual Defendants' own interests and their fiduciary obligations, and, if such conflicts exist, to ensure that all conflicts are resolved in the best interests of Apco's public

stockholders; (e) actively evaluate the Proposed Transaction and engage in a meaningful auction with third parties in an attempt to obtain the best value on any sale of Apco; and (f) disclose all material information to the Company's stockholders.

96.     The Individual Defendants have breached their fiduciary duties to plaintiff and the Class.

97.     As alleged herein, the Individual Defendants have initiated a process to sell Apco that undervalues the Company.  In addition, by agreeing to the Proposed Transaction, the Individual Defendants have capped the price of Apco at a price that does not adequately reflect the Company's true value.  The Individual Defendants also failed to sufficiently inform themselves of Apco's value, or disregarded the true value of the Company.  Furthermore, any alternate acquiror will be faced with engaging in discussions with a management team and Board that are committed to the Proposed Transaction.

98.     As such, unless the Individual Defendants' conduct is enjoined by the Court, they will continue to breach their fiduciary duties to plaintiff and the other members of the Class, and will further a process that inhibits the maximization of stockholder value.

99.     Plaintiff and the members of the Class have no adequate remedy at law.

## COUNT IV

**(Aiding and Abetting the Board's Breaches of Fiduciary Duties
Against Apco and Pluspetrol)**

100.     Plaintiff repeats and realleges the preceding allegations as if fully set forth herein.

101.     Defendants Apco and Pluspetrol knowingly assisted the Individual Defendants' breaches of fiduciary duties in connection with the Proposed Transaction, which, without such aid, would not have occurred.  In connection with discussions regarding the Proposed Transaction, Apco provided, and Pluspetrol obtained, sensitive non-public information

concerning Apco and thus had unfair advantages that are enabling it to pursue the Proposed Transaction, which offers unfair and inadequate consideration.

102.    As a result of this conduct, plaintiff and the other members of the Class have been and will be damaged in that they have been and will be prevented from obtaining fair consideration for their Apco shares.

103.    Plaintiff and the members of the Class have no adequate remedy at law.

## PRAYER FOR RELIEF

**WHEREFORE**, plaintiff prays for judgment and relief as follows:

A.    Ordering that this action may be maintained as a class action and certifying plaintiff as the Class representative and plaintiff's counsel as Class counsel;

B.    Preliminarily and permanently enjoining defendants and all persons acting in concert with them from proceeding with, consummating, or closing the Proposed Transaction;

C.    In the event defendants consummate the Proposed Transaction, rescinding it and setting it aside or awarding rescissory damages to plaintiff and the Class;

D.    Directing defendants to account to plaintiff and the Class for their damages sustained because of the wrongs complained of herein;

E.    Directing the Individual Defendants to file a proxy that does not contain any untrue statements of material fact and that states all material facts required in it or necessary to make the statements contained therein not misleading;

F.    Declaring that defendants violated Sections 14(a) and/or 20(a) of the 1934 Act, as well as Rule 14a-9 promulgated thereunder;

G.    Awarding plaintiff the costs of this action, including reasonable allowance for plaintiff's attorneys' and experts' fees; and

H.    Granting such other and further relief as this Court may deem just and proper.

## JURY DEMAND

Plaintiff hereby demands trial by jury.

Dated: November 24, 2014

Respectfully submitted,

**FEDERMAN & SHERWOOD**

/s/ William B. Federman
William B. Federman, OBA #2853
Gregg J. Lytle, OBA #20759
10205 N. Pennsylvania Ave.
Oklahoma City, Oklahoma 73120
Telephone:  (405) 235-1560
Facsimile:  (405) 239-2112
wbf@federmanlaw.com
gjl@federmanlaw.com

-and-

**RIGRODSKY & LONG, P.A.**
Seth D. Rigrodsky (*pro hac vice to be filed*)
Brian D. Long (*pro hac vice to be filed*)
Gina M. Serra (*pro hac vice to be filed*)
Jeremy J. Riley (*pro hac vice to be filed*)
2 Righter Parkway, Suite 120
Wilmington, DE 19803
(302) 295-5310

**RYAN & MANISKAS, LLP**
Katharine M. Ryan
(*pro hac vice to be filed*)
Richard A. Maniskas
(*pro hac vice to be filed*)
995 Old Eagle School Rd., Suite 311
Wayne, PA 19087
(484) 588-5516

*Counsel for Plaintiff*

**CERTIFICATION**

I, *GEORGE P. ASSAD Jr* ("Plaintiff") declare, as to the claims asserted under the federal securities laws that

1. Plaintiff has reviewed the complaint and authorizes its filing.

2. Plaintiff did not purchase the security that is the subject of this action at the direction of Plaintiff's counsel or in order to participate in any private action.

3. Plaintiff is willing to serve as a representative party on behalf of the class, either individually or as part of a group, including providing testimony at deposition or trial, if necessary. I understand that is not a claim form, and that my ability to share in any recovery as a member of the class is not dependent upon execution of this Plaintiff Certification.

4. Plaintiff's purchase and sale transaction(s) in the Apco Oil & Gas International Inc. (NASDAQ: APAGF) security that is the subject of this action during the Class Period is/are as follows:

**PURCHASERS**                                                    **SALES**

| Buy Date | Shares | Price per Share |
|----------|--------|-----------------|
| 05/06/08 | 101 | 20.4796 |
| | | |
| | | |
| | | |

| Sell Date | Shares | Price per Share |
|-----------|--------|-----------------|
| NONE | | |
| | | |
| | | |
| | | |

(Please list additional purchase and sale information on a separate sheet of paper, if necessary)

5. Plaintiff has complete authority to bring a suit to recover for investment losses on behalf of purchasers of the subject securities described herein (including Plaintiff, any co-owners, any corporations or other entities, and/or any beneficial owners).

6. During the three years prior to the date of this Certification, Plaintiff has not sought to serve or served as a representative party for a class in an action filed under the federal securities laws, except as described below_____.

7. Plaintiff will not accept any payment for serving as a representative party on behalf of the class beyond Plaintiff's pro rata share of any recovery, except such reasonable costs and expenses (including lost wages) directly relating to the representation of the class as ordered or approved by the court.

I declare under penalty of perjury that the foregoing is true and correct.

Executed this *4TH* day of *NOV*, 2014.

*George P. Assad Jr*
GEORGE P. ASSAD, Jr                             *GEORGE P. ASSAD, Jr*
Signature                                                    Print Name